UNITED STATES OF AMERICA
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION / WORCESTER

_____

JASON MULLEN,
                Plaintiff

v.

THE COMMOWEALTH OF MASSACHSETTS
MASSACHUSETTS DEPARTMENT OF CORRECTIONS,
and
ACTING SUPERINTENT DEPUTY CHRISTOPHER PHILLIPS.
(in his official and in his individual capacity)
and
LEUTENTANT JAMES GEARIN
(in his official and in his individual capacity)
and
IPPS OFFICER WILLIAM STANHOPE
(in his official and in his individual capacity)
and
SERGEANT JAMES TETREAULT
(in his official and in his individual capacity)
and
CORRECTIONAL OFFICER NICHOLAS CARPENO
(in his official and in his individual capacity)
and
CORRECTIONAL OFFICER ERICK COLSTON
(in his official and in his individual capacity)
and
CORRECTIONAL OFFICER MATTHEW BADJO
(in his official and in his individual capacity)
and
CORRECTIONAL OFFICER DAVID BOURGEOIS
(in his official and in his individual capacity)

                Defendants
_____

## COMPLAINT
## AND
## DEMAND FOR A JURY TRIAL

## INTRODUCTORY STATEMENT OF CLAIMS

1. This lawsuit arises out of an unprovoked and malicious beating perpetrated by a special team of correctional officers known as the MOVE TEAM against JASON MULLEN (hereinafter MULLEN), a current detainee at SOUZA-BARANOWSKI, a super-maximum prison facility operated by the Commonwealth of Massachusetts Department of Corrections.

2. MULLEN was seriously injured from the beating. MULLEN made a formal grievance seeking that the staff involved with the incident be retrained and that he be awarded damages for his injuries. Rather than conducting an appropriate investigation, employees and staff working for the Commonwealth of Massachusetts Department of Correction engaged in cover-up to conceal the unconstitutional attack upon MULLEN by members of the MOVE TEAM;

3. Due to the serious injuries suffered by MULLEN during the beating, MULLEN submitted numerous SICK CALL REQUEST FORMS. Employees of the Commonwealth of Massachusetts Department of Corrections ignored MULLEN's requests for medical treatment and continued to deny him appropriate medical treatment despite doctor's orders and doctor's recommended treatment;

4. The lawsuit seeks damages for: (a) the use of excessive force in violation of the Fourth and Fourteenth Amendment to the United States Constitution; (b) the denial of adequate medical care in violation of the Fourth and Fourteenth Amendment to the United States Constitution; (c) the cover-up of the use of excessive force pursuant to an official policy of the Commonwealth of Massachusetts Department of Corrections in violation of Fourth and Fourteenth Amendment to the United States Constitution; (d) the intentional

inflication of assault and battery by individual correctional officers; ( e ) the intentional assault and battery by individual correctional officers and (f) the intentional infliction of emotional distress inflicted by individual correctional officers;

5.  The lawsuit seeks INJUNCTIVE RELIEF to prevent ongoing and future injury to the plaintiff's eyesight;

## JURSIDICTION AND VENUE

6.  This action is brought pursuant to 42 U.S.C. §1983, the Fourth and Fourteenth Amendments to the United States Constitution. Jurisdiction is confered upon this Court under 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4), as this is a civil action arising under the U.S. Constitution and under the laws of the United States. The court has ancillary jurisdiction to hear MULLEN's state tort claims;

7.  Venue is proper here pursuant to 28 U.S.C. §1391(a), (b) and (c) because all of the events giving rise to MULLEN's claims occurred in Shirly, Massachusetts which is located in the District of Massachusetts in the Central Division;

## PARTIES

8.  The plaintiff, JASON MULLEN, is a natural person and currently a resident of the Massachusetts Department of Correction at SOUZA-BARANOWKSI;

9.  The defendant, the DEPARTMENT OF CORRECTIONS OF THE COMMONWEALTH of MASSACHUSETTS is public body corporate and politic, established, organized under and pursuant to the laws of the Commonwealth of Massachusetts, with the authority to sue and be sued, and was all times relevant hereto, operating within its scope and authority under the color of state law;

10. The defendant, Acting Superintendent Deputy CHISTOPHER PHELPS, is a natural person residing in and/or employed in the Commonwealth of Massachusetts. At all relevant times, CHRISTOPHER PHELPS was an employee of the Massachusetts Department of Corrections.  At all relevant times CHRISTOPHER PHELPS was acting under color of state law. He is being named in the matter in both his personal and his official capacities;

11. The defendant, Lieutenant JAMES GEARIN, is a natural person residing in and/or employed in the Commonwealth of Massachusetts. At all relevant times, JAMES GEARIN was an employee of the Massachusetts Department of Corrections. At all relevant times JAMES GEARIN was acting under color of state law. He is being named in the matter in both his personal and his official capacities;

12. The defendant, IPPS OFFICER WILLIAM STANHOPE, is a natural person residing in and/or employed in the Commonwealth of Massachusetts. At all relevant times, WILLIAM STANHOPE was an employee of the Massachusetts Department of Corrections. At all relevant times WILLIAM STANHOPE was acting under color of state law. He is being named in the matter in both his personal and his official capacities;

13. The defendant, Sergeant JAMES TETREAULT, is a natural person residing in and/or employed in the Commonwealth of Massachusetts. At all relevant times, JAMES TETREAULT was an employee of the Massachusetts Department of Corrections. At all relevant times JAMES TETREAULT was acting under color of state law. He is being named in the matter in both his personal and his official capacities;

14. The defendant, Correctional Officer NICHOLAS CARPENO, is a natural person residing in and/or employed in the Commonwealth of Massachusetts. At all relevant times,

NICHOLAS CARPENO was an employee of the Massachusetts Department of Corrections. At all relevant times NICHOLAS CARPENO was acting under color of state law. He is being named in the matter in both his personal and his official capacities;

15. The defendant, Correctional Officer ERICK COLSTON, is a natural person residing in and/or employed in the Commonwealth of Massachusetts. At all relevant times, ERICK COLSTON was an employee of the Massachusetts Department of Corrections. At all relevant times ERICK COLSTON was acting under color of state law. He is being named in the matter in both his personal and his official capacities;

16. The defendant, Correctional Officer MATTHEW BADJO, is a natural person residing in and/or employed in the Commonwealth of Massachusetts. At all relevant times, MATTHEW BADJO was an employee of the Massachusetts Department of Corrections. At all relevant times MATTHEW BADJO was acting under color of state law. He is being named in the matter in both his personal and his official capacities;

17. The defendant, Correctional Officer DAVID BOURGEOIS, is a natural person residing in and/or employed in the Commonwealth of Massachusetts. At all relevant times, DAVID BOURGEIOS was an employee of the Massachusetts Department of Corrections. At all relevant times DAVID BOURGEOIS was acting under color of state law. He is being named in the matter in both his personal and his official capacities;

## FACTS

### 2017 INCIDENT

18. In January 2017, MULLEN was one of approximately eighteen (18) inmates involved in riot at the Massachusetts Correctional Institution – Souza-Baranowski.

19. MULEN along with the other inmates took over and held a unit for approximately four hours.

20. Department of Correction tactical forces along with outside support, including the Massachusetts State Police, took back the unit with force.

21. After the incident, MULLEN was transported to MCI – Walpole.

22. MULLEN was charged criminally for his involvement in this incident.

23. MULLEN was also subjected to disciplinary action within the MCI system. MULLEN was ordered to serve fifteen (15) months in solitary confinement.

24. The January 2017 incident captured national headlines.

25. The January 2017 incident led to an internal investigation within the Massachusetts Correctional Institution.  Upon reason and belief, several of the correctional officers involved in the incident were disciplined for various violations.

26. MULLEN was returned to Souza-Baranowski during the Summer of  2018.

27. Upon his return to Souza-Baranowski, MULLEN was threatened by correction officers.

28. Among the correction officers that threatened him was Nicholas CARPENO.  CARPENO intimidated MULLEN with threats "to expect it when you least expect it"  and "you will get yours in the end."

29. MULLEN understood these statements to be a threat to cause him future physical harm.

30. These threats were made on regular basis over several months.

**NOVEMBER 21, 2018 BEATING**

31. On November 21, 2018, the night prior to Thanksgiving, the Souza-Baranowski facility was working short staffed;

32. On November 21, 2018, MULLEN was taken from his cell and brought to the non-contact visiting area.

33. MULLEN was placed in the locked 4' x 6' prisoner portion of the visiting box and MULLEN was informed that his cell was being inspected;

34. After waiting several minutes, IPPS Officer WILLIAM STANHOPE informed MULLEN that scratch marks had been discovered on the floor of his cell.;

35. MULLEN was informed that he was going to be restrained and escorted to the "hole" also known as the special management unit;

36. MULLEN protested. MULLEN indicated that there were no scratch marks on the floor of his cell and that the charges were a fabrication.

37. STANHOPE left MULLEN in the 4' x 6' cell;

38. Approximately, five (5) minutes later, STANHOPE returned accompanied by several correctional officers that were members of the MOVE TEAM. These correctional officers were dressed in full combat gear;

39. The correctional officers on this MOVE TEAM  included: Lieutenant JAMES GEARIN, IPPS Officer WILLIAM STANHOPE, Sergeant JAMES TETREAULT,  Correctional Officer NICHOLAS CARPENO,  Correctional Officer ERICK COLSTON, Correctional Officer MATTHEW BADJO; and Correctional Officer DAVID BOURGEOIS;

40.  IPPS Officer STANHOPE had a handheld video camera in his possession;

41. All members of the MOVE TEAM gathered around the door to the cell;

42. Without the need for physical engagement, IPPS Officer contacted Acting Superintendent Deputy CHRISTOPHER PHELPS and requested use of force tactics including the use of oleoresin Capsicum (O.C.) Spray and the use of a physical cell extraction;

43. Without justification,  Acting Superintendent Deputy CHRISTOPHER PHELPS authorized the use of force;

44. TETREAULT initiated at least one blast of OC spray into the cell. The OC had the desired effect of disabling MULLEN.

45. The cell door was opened and CARPENO and COLSTON rushed at MULLEN.

46. MULLEN offered no resistance

47. MULLEN was knocked to the floor of the cell by CARPENO and COLSTON

48. MULLEN was placed in handcuffs and leg irons by CARPENO and COLSTON;

49. MULLEN offered no resistance to being restrained in handcuffs and leg irons;

50. After cuffing MULLEN and placing leg irons on MULLEN  and while MULLEN was still prone on the floor of the cell, CARPENO and COLSTON began to punch MULLEN in the head from both sides.

51. MULLEN was struck with closed fists by both CARPENO and COLSTON approximately fifteen (15) to twenty (20) times.

52. MULLEN was punched with such force and aggression  that he eventually was knocked unconscious.

53. When MULLEN regained consciousness, CARPENO and COLSTON were still punching him in the head.

54. MULLEN, fearing that he was going to die or be rendered brain damaged, cried out for help.

55. None of the other members of the MOVE TEAM present intervened to stop the beating;

56. MULLEN begged CARPENO and COLSTON stop punching him. The beating eventually stopped.

57. During the time that CARPENO and COLSTON were punching MULLEN, the other members of the MOVE TEAM stood by outside the cell and permitted the beating to take place.

58. GEARIN, TETRAULT, STANHOPE, BADJO and BOURGEOIS stood by and failed to intervene while CARPENO and COLSTON used excessive force to beat MULLEN;

59. During the entire event, STANHOPE averted the camera to avoid capturing the beating on videotape;

60. After the beating MULLEN was picked up off the floor by CARPENO and COLSTON;

61. Unable to stand, MULLEN collapsed to the floor.

62. After several unsuccessful attempts to get MULLEN to his feet, a gurney was requested to transport MULLEN to the medical ward. While being transported to the medical ward, MULLEN fell into unconsciousness again;

## DENIAL OF MEDICAL TREATMENT

63. In the medical ward, MULLEN was unresponsive.

64. Efforts to revive him through pain stimulus (sternum rub) were initially unsuccessful;

65. MULLEN eventually regained consciousness;

66. MULLEN sustained a 2-to-3-inch gash above his left eye; ecchymosis of the left eye; ten (10) to twelve (12) large hematomas on the top, side and back of the head; significant bruising on the side and back of the head; and a swollen and bruised ear. [SEE: EXHIBIT #3];

67. Within hours of the incident, MULLEN noted and complained of blurry vision in his left eye;

68. MULLEN was told by medical staff at the prison that his injuries looked serious;

69. MULLEN was informed by a nurse on the prison's medical ward that an ambulance had been called to transport him to Leominster Hospital for head trauma;

70. Immedicatley after being informed that he would be transferred to the hospital, MULLEN observed GUERIN escort the nurse away from MULLEN's earshot.  Ater a brief conversation between GUERIN and the nurse, MULLEN observed the nurse go to the telephone and make a phone call;

71. The nurse returned to MULLEN and informed him that the ambulance was being cancelled and that he would spend the evening in the medical ward;

72. At no time prior to cancelling the ambulance did MULLEN's physical condition improve;

73. At no time prior to cancelling the ambulance did the medical staff at the prison re-check MULLEN's vital signs;

74. At no time prior to cancelling the ambulance did medical staff at the prison re-check MULLEN's pupils' reaction to light stimuli;

75. MULLEN was placed in a bed located in a cell in the medical ward.

76. The next day, November 22, 2021, MULLEN was found in a pool of his own vomit, unconscious in his medical ward bed;

77. Medical staff at the jail were unable to revive MULLEN;

78. MULLEN was transported to Leominster Hospital Emergency Room Department.

79. After regaining consciousness at the hospital, MULLEN was informed by the emergency room doctor that his injuries were significant and that he should have been transported to the hospital the previous evening.

80. After returning to SOUZA-BARANOWSKI, MULLEN continued to experience a lack of vision in his left eye, stabbing pain in his eye and frequent headaches,

81. MULLEN submitted numerous sick call slips regarding problems with his vision, pain in his eye and headaches. The sick call slips were ignored;

82. MULLEN made numerous verbal complaints and requests for assistance to correctional officers and medical staff seeking treatment for the loss of vision and pain. These verbal complaints and requests for treatment were ignored;

83. MULLEN was repeatedly denied medical treatment.

84. Over one year from the date of the brutal attack, on December 16, 2019, MULLEN was taken to Boston Medical Center for examination of his left eye and his on-going visual impairment.

85. Doctor Crandel Peeler, MD noted:  "Patient with history of decreased vision in left eye, one year following trauma with normal optic nerve appearance here for 4 month follow up … 39-year-old male reports VA (visually acuity) left eye remains poor … patient reports some intermittent 'stabbing' pain [in] left eye … patient reports stable decreased vision since the time of the incident …" [SEE – EXHIBIT D]

86. Dr. Peeler ordered an MRI of the orbits at Boston Medical Center. Rather than following the doctor's order, the Commonwealth of Massachusetts Department of Corrections sent MULLEN to Shattuck Hospital where an MRI was done on the brain and not on the orbits;

87. On December 16, 2019, Dr. Peeler ordered a return visit in six months of sooner;

88. As of November 19, 2021, almost two years from the date of the last visit with an eye expert, MULLEN has not been transported to see Dr. Peeler or any other eye expert at Boston Medical Center or elsewhere;

**FAILURE TO INVESTIGATE GREIVANCE / COVER UP**

89. On November 28, 2018, MULLEN filed an Inmate Grievance Form concerning both the November 21, 2018 beating and the subsequent lack of medical treatment for ongoing injuries; [SEE – EXHIBIT E]

90. The Commonwealth of Massachusetts Department of Correction, through its staff, conducted a hollow, worthless, empty and fictitious investigation;

91. Despite photographs of MULLEN's injuries, medical records supporting MULLEN's head trauma, the video tape of the incident and MULLEN's written grievance, MULLEN was provided with an unsigned determination reading:  "grievance is denied an inquiry was conducted by SSI Gerardi and it has been determined that there was no evidence to support your allegations. No further investigation is warranted."

92. Defendant began to cover up and deny the November 21, 2018 incident as soon as it happened;

93. IPPS Officer Stanhope averted the video camera in an effort to avoid filming the beating;

94. On the evening of the attack, Lieutenant Gearin instructed medical staff to cancel an ambulance and cancel MULLEN's transfer to the hospital so as to cover-up the beating and keep the matter "in-house;"

95. On the evening of the attack, MULLEN was afforded minimal medical treatment. He was placed in an unsupervised cell where he fell into unconsciousness and vomited himself.

96. This information was not included in any of the investigative reports. Rather the reports indicate the "non-serious" nature of injuries;

97. MULLEN's grievance was received by the Department on December 3, 2018;

98. The decision that the grievance was unfounded was rendered on January 2, 2019, less that a month after the grievance was received;

**THE COVER-UP IS AN OFFICIAL POLICE OF THE DEPARTMENT OF CORRECTIONS**

99. The minimalization of beatings conducted by correction officers and the cover-up of such beatings by means of empty and false investigations are part of an institutional practice or custom, constituting an official policy of the Commonwealth of Massachusetts Department of Corrections of covering up of instances of serious misconduct, especially the use of excessive force by MOVE TEAM guards, and of sanctioning repeated interference by correctional officers;

100.    On information and believe Correctional Officer Nicholas CARPENO has been the subject of previous excessive force claims which were covered-up or minimalized  by the Commonwealth of Massachusetts Department of Corrections;

101.    The Commonwealth of Massachusetts Department of Correction had prior notice of the propensity of members of the MOVE TEAM to utilize excessive force on inmates;

102.    The Commonwealth of Massachusetts Department of Correction failed to properly supervise and train the employees on the MOVE TEAM to avoid the use of force, especially the use of excessive force when dealing with inmates;

103.    On information and belief, The Commonwealth of Massachusetts Department of Correction has tolerated, as an institutional policy, practice or custom, or authorized and ratified the systemic pattern by their employees of covering up the excessive use of force

by correctional officers, with the intention of having the effect of depriving MULLEN

and other detainees of their rights and privileges afforded to them by the United States

Constitution;

104.    The effect of this cover-up policy is to encourage Commonwealth of

Massachusetts Department of Correction employees, including the defendants Gearin,

Stanhope, Carpeno, Tetreault, Colston, Badjo and Bourgeois, to use excessive force

against detainees. In doing so, the policy and custom contributed to the physical assault

on MULLEN and his resulting injuries;

105.    The practice and custom include the following tactics by The Commonwealth of

Massachusetts Department of Correction which are used so frequently that they amount

to the official policy of the Department of Corrections:

a.  Responding to MULLEN's and other detainees' complaints of misconduct, including

excessive use of force, with inadequate investigations and grievances responses

calculated to mislead the public and show a deliberate indifferent attitude toward

official misconduct;

b.  Providing no support for neutral and complete investigations in which third parties

are interviewed and a neutral investigator is utilized;

c.  Allowing correctional officers being investigated for serious charges of excessive

force to continue working while the investigations are ongoing;

d.  Failing to remove officers from assignments in which they come in contact with

detainees while they are being investigated for serious charges such as the use of

excessive force against these detainees;

e. Providing no protection or incentives for employees who are witnesses to excessive force to cooperate with investigations by telling the truth about what they saw or to report instances of excessive force about what they learn about, and instead providing incentives for covering up excessive force;

f. Creating an atmosphere where medical personal at The Commonwealth of Massachusetts Department of Correction are discouraged from treating inmates' injuries injured by excessive force promptly and adequately, from documenting the injuries appropriately, and from cooperating with investigators by telling the truth about the injuries and instead providing incentives for The Commonwealth of Massachusetts Department of Correction medical personal to cover up excessive force;

g. Failing to provide serious and appropriate punishment when charges of excessive force are sustained but instead providing trivial punishment that is not designed to act as a deterrent to the use of excessive force;

h. Failing to support The Commonwealth of Massachusetts Department of Correction's medical personal decision to order the transport of  inmates injured by excessive use of force to outside hospital treatment in an effort to cover up the excessive force from public knowledge;

i. Failing to implement and utilize a valid investigative procedure by the Commonwealth of Massachusetts itself, instead of permitting the Department of Corrections to investigate itself.

**MULLEN CONTINUES TO SUUFER FROM INJURIES**

106.     MULLEN has sustained permanent physical injuries and psychological trauma,

has suffered great pain and discomfort and continues to experience physical and

psychological damage.

107.     MULLEN's vision in his left eye continues to worsen.

108.     MULLEN is receiving no medical attention to address the loss of vision in his left

eye;

**COUNT ONE**
**INJUNCTIVE RELIEF**

109.     MULLEN restates the allegations set forth in the above paragraphs;

110.     MULLEN seeks injunctive relief.

111.     MULLEN requests, that as soon as possible, the court issue an order requiring the

defendant, Commonwealth of Massachusetts Department of Corrections to transport

MULLEN to the Yew Eye Clinic at the Boston Medical Center to receive follow-up

examination on his eft eye and that Department of Corrections be required to assist

MULLEN in following the medical recommendations from the doctors at Boston

Medical Center;

112.     MULLEN asserts that irreparable injury to his eyesight  will occur in the absence

of such an order.

113.     MULLEN asserts that the threatened injury to his eyesight outweighs the harm or

the burden to the opposing party resulting from the order;

114.     MULLEN asserts that injunction is not averse to the public interest;

115.     MULLEN asserts that he has a substantial likelihood of success on the merits

**COUNT TWO**
**42 USC §1983 – EXCESSIVE FORCE**
**AGAINST DEFENANTS NICOLAS CARPENO, ERICK COLSTON,**
**JAMES GEARIN and CHRISTOPHER PHELPS**

116.     MULLEN reinstates the allegations set forth in the above paragraphs;

117.     MULLEN makes a claim under 42 U.S.C. §1983 for violation of the Fourth and

Fourteenth Amendments of the United States Constitution;

118.     The Fourth and the Fourteenth Amendments does not permit defendants to use

excessive force. The right to be free from excessive force is clearly established under the

Fourth Amendment.

119.     The proper analysis of excessive force of detainees is under an objective

reasonableness standard;

120.     Relevant circumstances to the reasonableness of the force used by correctional

officers include (a) the severity of the actions being taken by the detainee; (b) whether the

detainee poses an immediate threat to the safety of the correctional officers or others; and

(c) whether the detainee is actively resisting the correctional officer;

121.      An individual's use of force against another in never reasonable if it is excessive;

122.     CHRISTOPHER PHELPS' authorization of the use of O.C. Spray and the

Physical Extraction of MULLEN was not reasonable under the circumstances and was in

fact excessive;

123.     JAMES GEARIN's use of O.C. spray to disable MULLEN was not reasonable

under the circumstances and was in fact excessive;

124.     Defendant, NICHOLAS CARPENO's use of force against MULLEN, while

punching and striking him with a closed fist 15 to 20 times until unconscious, was not

reasonable under the circumstances and was in fact excessive;

125.     Defendant, ERICK COLSTON's use of force against MULLEN, while punching and striking him with a closed fist 15 to 20 times until unconscious, was not reasonable under the circumstances and was in fact excessive;

126.     WHEREFORE, the authorization for the use of excessive force demonstrated by CHRISTOPHER PHELPS was the direct and proximate cause of the injuries suffered by MULLEN.

127.     WHEREFORE, the unprovoked use of the O.C. Spray by JAMES GEARIN was excessive and was the direct and proximate result of the injuries suffered by MULLEN;

128.     WHEREFORE, the excessive use of force demonstrated by NICHOLAS CARPENO and ERICK COLSTON in repeatedly punching ant beating MULLEN was the direct and proximate cause of the injuries suffered by MULLEN.

<strong><u>COUNT THREE<br>42 U.S.C. §1983 – DUTY TO INTERVENE<br>AGAINST DEFENDANTS JAMES GEARIN, WILLIAM STANHOPE,<br>JAMES TETREAULT, MATTHEW BADJO and DAVID BOURGEOIS</u></strong>

129.      MULLEN reinstates the allegations set forth in the above paragraphs;

130.     Plaintiff brings this claim under 42 U.S.C. §1983 for violation of the Fourth and Fourteenth Amendments of the U.S. Constitution;

131.     The Defendants CARPENO's and COLSTON's use of force against MULLEN was clearly excessive to any person witnessing the brutal physical attack;

132.     The Defendants GEARIN, STANHOPE, TETREAULT, BADJO and BOURGEOIS had a duty to intervene and protect MULLEN but failed to do so as required by law;

133.     The Defendants GEARIN, STANHOPE, TETREAULT, BADJO and BOURGEOIS knew or should have known that when confronted with obvious excessive force they had a duty to intervene;

134.     WHEREFORE, as a direct and proximate result of the Defendants GEARIN, STANHOPE, TETREAULT, BADJO and BOURGEOIS inaction, MULLEN has suffered damages;

**COUNT FOUR**
**42 U.S.C. §1983 – MONELL CLAIM (INADEQUATE INVESTIGATION)**
**AGAINST – COMMONWEALTH OF MASSACHUSETTS**
**DEPARTMENT OF CORRECTIONS**

135.     MULLEN reinstates the allegations set forth in the above paragraphs;

136.     Governmental bodies are liable for the constitutional violations under 42 U.S.C. § 1983 when execution of its official policy or custom deprives an individual of his rights protected under the U.S. Constitution;

137.     Such governmental liability exists where a government agency fails to properly train, supervise, and discipline its employees amounting in a deliberate indifference to one's constitutional rights;

138.     At all times relevant the Commonwealth of Massachusetts, Department of Corrections had a duty to properly train, supervise and discipline the employees and agents;

139.     The defendant, the Commonwealth of Massachusetts, Department of Corrections breached that duty by:

    a.  Improperly training, authorizing, encouraging or directing correctional officers to use excessive force;

    b.  Failing to investigate allegations of excessive force;

     c.   Failing to discipline officers for violations of excessive force;

     d.   Encouraging and fostering a culture in which correctional officers' use of excessive force is condoned and encouraged;

140.     The policy, pattern or practice, or custom of condoned misconduct is tacitly or overly sanctioned, as evidenced by the conduct of defendants CARPENO and COLSTON and the defendant Department of Corrections failure to train, supervise, investigate and discipline any of the officers involved in this incident amounts to deliberate indifference to MULLEN's constitutional rights;

141.     The policy, pattern or practice, or custom of condoned misconduct is tacitly or overly sanctioned, as evidenced by the inaction of defendants GEARIN, STANHOPE, TETRAULT, BADJO, BOURGEOIS and the defendant Department of Corrections failure to train, supervise, investigate and discipline any of the officers involved in this incident amounting to deliberate indifference to MULLEN's constitutional rights;

142.     This unconstitutional behavior of officers is carried out pursuant to a policy, pattern of practice or custom, whether formal or informal, which violates the constitutional rights of persons similarly situated such as MULLEN;

143.     The defendant, Commonwealth of Massachusetts, Department of Corrections condoning of the misconduct, and the failure to end the policy, pattern of practice, or custom was a proximate cause to the MULLEN's injuries;

144.     WHEREFORE, as a direct and proximate cause of the actions of the defendant, the Commonwealth of Massachusetts, Department of Corrections, MULLEN has suffered damages;

<u>COUNT FIVE</u>
<u>42 U.S.C. §1983 – MONELL CLAIM (FAILURE TO PROVIDE MEDICAL CARE)</u>
<u>AGAINST – COMMONWEALTH OF MASSACHUSETTS</u>
<u>DEPARTMENT OF CORRECTIONS</u>

145.      MULLEN reinstates the allegations set forth in the above paragraphs;

146.      Governmental bodies are liable for the constitutional violations under 42 U.S.C. §
1983 when execution of its official policy or custom deprives an individual of his rights
protected under the U.S. Constitution;

147.      Such governmental liability exists where a government agency fails to properly
train, supervise, and discipline its employees amounting in a deliberate indifference to
one's constitutional rights;

148.      At all times relevant the Commonwealth of Massachusetts, Department of
Corrections had a duty to provide adequate medical attention to MULLEN and other
detainees;

149.      The defendant, the Commonwealth of Massachusetts, Department of Corrections
breached that duty by:

    a.  Failing to provide proper emergency medical attention to MULLEN;

    b.  Electing to cover-up correctional officers use of excessive force at the detriment
of MULLEN receiving proper medical treatment;

    c.  Failing to provide long time medical attention to MULLEN regarding the care and
treatment of his eyesight;

150.      This failure to provide proper medical attention to detainees when injuries are
caused by unconstitutional behavior of officers is carried out pursuant to a policy, pattern
of practice or custom, whether formal or informal, which violates the constitutional rights
of persons situated such as MULLEN;

151.     The defendant, Commonwealth of Massachusetts, Department of Corrections condoning of the misconduct, and the failure to end the policy, pattern of practice, or custom was a proximate cause to the MULLEN's injuries;

152.     WHEREFORE, as a direct and proximate cause of the actions of the defendant, the Commonwealth of Massachusetts, Department of Corrections, MULLEN has suffered damages;

**COUNT SIX**
**ASSAULT AND BATTERY - INTENTIONAL**
**AGAINST NICHOLAS CARPENO and ERICK COLSTON**

153.     MULLEN hereby incorporates all of the proceeding paragraphs of this Compliant as if fully set forth herein;

154.     CARPENO intentionally touched the person of MULLEN without justification or excuse;

155.     To the extent that CARPENO had a justification to touch MULLEN's person, the manner of touching was unreasonably brutal and exceeded the force that was necessary;

156.     MULLEN did not consent to CARPENO's touching of his person;

157.     MULLEN suffered physical and emotional pain and suffering as a proximate result of the CARPENO touching of his person;

158.     MULLEN suffered economic damages as a proximate result of CARPENO's touching his person.

159.     COLSTON intentionally touched the person of MULLEN without justification or excuse;

160.     To the extent that COLSTON had a justification to touch MULLEN's person, the manner of touching was unreasonably brutal and exceeded the force that was necessary;

161.      MULLEN did not consent to COLSTON's touching of his person;

162.      MULLEN suffered physical and emotional pain and suffering as a proximate result of the COLSTON touching of his person;

163.      MULLEN suffered economic damages as a proximate result of COLSTON's touching his person.

**COUNT SEVEN**
**INFLICTION OF EMOTIONAL DISTRESS – INTENTIONAL**
**AGAINST NICHOLAS CARPENO AND ERICK COLSTON**

164.      MULLEN hereby incorporates all of the proceeding paragraphs of this Compliant as if fully set forth herein;

165.      CARPENO acted intentionally when he brutely beat MULLEN causing significant injury;

166.      CARPENO's conduct was extreme and outrageous and beyond the bounds of decency in a civilized society;

167.      CARPENO's actions were the proximate cause of MULLEN's personal injuries;

168.      MULLEN suffered and continues to suffer extreme emotional distress;

169.      COLSTON acted intentionally when he brutely beat MULLEN causing significant injury;

170.      COLSTON's conduct was extreme and outrageous and beyond the bounds of decency in a civilized society;

171.      COLSTON's actions were the proximate cause of MULLEN's personal injuries;

172.      MULLEN suffered and continues to suffer extreme emotional distress.

# **PRAYER FOR RELIEF**

WHEREFORE, MULLEN requests that this Court enter judgment in favor of the Plaintiff and against the Defendants and grant the following:

A.  Enter a declaratory judgment on behalf of the Plaintiff that the Defendants' policies, pattern of practices, customs, lack of supervision, failure to train, acts and omissions described herein, constituted excessive force in violation of the Fourth and Fourteen Amendments and in violation Massachusetts laws;

B.  Permanently enjoin and prohibit the Defendants from interfering with Plaintiff constitutionally and statutorily protected right to adequate medical care and INJUCTIVE RELIEF to:

   a.  Provide plaintiff with access to outside eye specialists;

   b.  Provide plaintiff with the care and treatment ordered by the eye specialists;

   c.  Provide plaintiff with proper accommodations for his vision loss;

C.  Enter judgment on behalf of the Plaintiff against the defendants for reasonable and actual damages to compensate for the violation of the Fourth and Fourteenth Amendments and for the violation of the common law, including but not limited to:

   a.  Compensation for the immediate physical pain and suffering plaintiff experienced at the time of the beating;

   b.  Compensation for the immediate phycological l pain and suffering plaintiff experienced at the time of the beating;

   c.  Compensation for the plaintiff's long term physical pain and suffering;

   d.  Compensation for the plaintiff's long term phycological pain and suffering;

   e.  Compensation for permanent injuries to the plaintiff's vision;

    f.   Compensation for permanent injuries to the plaintiff's person caused by scarring;

    g.   Compensation for plaintiff's emotional distress;

    h.   Compensation for plaintiff's embarrassment and humiliation;

    i.   Compensation for lost earning potential;

    j.   Compensation for future medical bills;

    k.   Compensation for future costs of accommodating the plaintiff's blindness;

D.  Enter a judgement on behalf of the Plaintiff against the Defendants and order the Defendants to pay punitive and other exemplary damages based on 42 U.S.C. § 1983;

E.  Enter a judgement on behalf of the Plaintiff against the Defendants and order the Defendants to pay the Plaintiff's attorneys' fees and costs as authorized by 42 U.S.C. § 1983 and 42 U.S.C. § 1983;

F.  Enter a judgement on behalf of the Plaintiff against the Defendants and order the Defendants to pay pre-judgement interest;

G.  Grant all other additional relief to which the plaintiff may be entitled

H.  PLAINTIFF CLAIMS A **<u>JURY TRIAL</u>** ON ALL COUNTS SO TRIABLE


                               Respectfully submitted,
                               JASON MELLEN, the plaintiff
                               by the plaintiffs' attorney

November 20, 2021          /s/  *Alfred P. Chamberland*
                               Alfred P. Chamberland
                               BBO # 564151
                               5 Arthur Street, PO Box 217
                               Easthampton, MA 01027
                               Office Telephone (413) 529 0404
                               Cell Phone (413) 210-6579
                               E-mail:  attorney.chamberland@gmail.com