## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JASON MULLEN,<br>        **Plaintiff,**<br><br>v.<br><br>DEPARTMENT OF CORRECTIONS OF<br>MASSACHUSETTS, CHRISTOPHER<br>PHILLIPS, JAMES GEARIN,<br>WILLIAM STANHOPE, JAMES<br>TETREAULT, NICHOLAS CARPENO,<br>ERICK COLSTON, MATTHEW BADJO,<br>and DAVID BOURGEOIS<br><br>        **Defendants.** | Civ. No. 4:21-cv-40116-MRG |

### ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [ECF. NO. 77] & DEFENDANTS' MOTION TO STRIKE [ECF NO. 92]

**GUZMAN, J.**

Plaintiff Jason Mullen ("Mullen" or "Plaintiff") brings this civil lawsuit against officers from the Massachusetts Department of Corrections ("DOC") for alleged violations of his rights under the Eighth and Fourteenth Amendments. During all times relevant to this case, Mullen was detained at Souza-Baranowski Correctional Center ("SBCC") in Shirley, Massachusetts. [ECF No. 79 ¶ 1]. Mullen alleges that officers used excessive force against him on November 21, 2018, when they executed a MOVE from his cell, sprayed him with pepper spray, and physically beat him while in shackles prior to the MOVE. [See ECF No. 1 ¶¶ 41-56]. Mullen asserts that the physical attack was retribution for his part in a riot that occurred at Souza-Baranowski a year prior. [ECF No. 87 ¶¶ 4-5]. He asserts that this incident led to deteriorating vision and eventual blindness in his left eye and severe emotional trauma. [ECF No. 87 ¶¶ 57-58]. Before the Court is Defendants' summary judgment motion [ECF No. 77] on four counts:

excessive force and failure to intervene claims under 42 U.S.C. §1983 in violations of Mullen's Eighth and Fourteenth Amendment rights, and state tort claims of assault and battery, and intentional infliction of emotional distress. Mullen sues these officials in their personal capacity.

For the reasons stated below, the motion is **<u>DENIED</u>** as to all counts.

## I.    <u>BACKGROUND</u>[1]

This civil rights lawsuit arises from an incident while Plaintiff was incarcerated at Souza-Baranowski. [ECF No. 87 ¶ 1]. It is undisputed that in January 2017, Plaintiff participated in a riot at SBCC, after which he was transported to MCI-Walpole for approximately one year. [<u>Id.</u> ¶ 2-3]. Plaintiff alleges that upon his return to SBCC in the summer of 2018, he was regularly threatened by correctional officers for his participation in the riot, including by Defendant Officer Carpeno. [<u>Id.</u> ¶¶ 4-5].

### A) Use of Force

On November 21, 2018, Mullen was removed from his cell and transferred to the inmate side of a non-contact visitor cell. [<u>Id.</u> ¶ 6]. The space in this cell was approximately four feet by four feet. [<u>Id.</u> ¶ 7]. Plaintiff was informed that he would be transferred from his cell to segregation ("the hole" or "Restrictive Housing Unit" or "RHU"), as punishment for "score marks" discovered by officers on the floor of his cell. [<u>Id.</u> ¶ 8]. Mullen stated to the officers that he would not comply with the transfer. [<u>Id.</u> ¶ 9; ECF No. 79 ¶ 13].[2] A MOVE team was assembled to affect the transfer of Mullen to segregation and was authorized to use force to complete the MOVE. [ECF No. 87 ¶10; ECF No. 79 ¶ 16]. The MOVE team consisted of Defendants Gearin, Stanhope, Tetrault, Carpeno, Colston, Badjo, and Bourgeois. The team was joined by

---

[1] The facts are drawn from Plaintiff's Complaint [ECF No. 1], Defendants' Joint Local Rule 56.1 Concise Statement of Undisputed Material Facts [ECF No. 79], Plaintiff's Responsive Local Rule 56.1 Statement of Material Facts [ECF No. 87], the documents cited therein, and video evidence provided by the parties [ECF No. 87-3]. Unless otherwise noted, these facts are undisputed.

[2] Mullen asserts that he refused to comply with the transfer because he believed an officer placed the score marks on his cell floor after he left as a pretext for sending him to segregation. [ECF No. 87 ¶ 8; Mullen Dep. 31:10-20, ECF No. 87-1].

Jennifer Robles, a nurse employed by Wellpath,[3] to work as a required "impartial" for the planned use of force. [ECF No. 87 ¶ 11; ECF No. 79 ¶¶ 17-18]. The team was dressed in riot gear for the MOVE and was equipped with oleoresin capsicum ("O.C.") spray and shields. [ECF No. 87 ¶¶ 12-13]. Once assembled, Robles asked if Mullen would comply with the transfer and informed him that the MOVE team was authorized to use force. [ECF No. 79 ¶ 18]. Mullen said "lady, I know what I'm doing, have a good night." [Id. ¶ 19; SBCC DVD Disk, ECF No. 87-3, Video 3 ("V.3"), 00:20].[4]  The MOVE team then asked Mullen to "cuff up," when he refused, they sprayed OC into the cell. [ECF No. 87 ¶¶ 114-5; SBCC DVD Disk, ECF No.87-3, Video 5 ("V.5"), 00:45]. The team asked once more if Mullen would comply, then the team sprayed the room again with O.C. [ECF No. 79 ¶ 26; V.5, 01:10]. After several seconds, the team asked once more if Mullen would comply and then entered the cell. [V.5, 1:33]. About three minutes passed between the opening of the cell door and Mullen being fully restrained in handcuffs and leg shackles to be brought out of the cell. [ECF No. 79 ¶ 29; V.5, 1:42-4:58]. During this time, Mullen and the majority

---

[3] WellPath is an independent contractor utilized by the Massachusetts Department of Corrections to provide medical services at SBCC. [ECF No. 87 ¶ 34].

[4] In Mullen's Deposition on June 24, 2024, he stated that he had been incarcerated for approximately 15 years at SBCC and was subject to "use of force," more than once. [Mullen Dep. 42:7-23, ECF No. 87-1]:

> Q: [Y]ou're aware that if you are refusing an order or not going to be compliant that officers will then use force against you to move you to where they need to?
> A: Yes. I knew that. That was kind of standard procedure, par for the course. However, that move team and that extraction team normally just involved you being sprayed briefly with O.C. spray and a little roughed up briefly by the guards. They place you in handcuffs and remove you from the cell. That day is not what happened.
> Q: Okay. So. . . you knew that by you being noncompliant they were going to come in, as you say, maybe rough you up a little bit and spray you with O.C. spray?
> A: Yes, I did.
> Q: And you were willing to accept that at the time?
> A: Yes, for this reason: When you're falsely accused of something, you get a little upset about that. When that use of force is used, those incidences are reported to higher ups, which other incidences normally are not. That's kind of why some of us inmates do that to bring and shed light, so to speak on the incident by higher ups in the facility." [Mullen Dep. 46:5-47:7]

of officers are out of view of the camera. No video footage exists of Mullen's treatment while he was inside the cell. While officers were in the cell, the following can be heard on the video:

> Officer Gearin: Mullen are you gonna cuff up?
> Mullen: No.
> Gearin: Stop moving your feet!
> Mullen: I'm not!
> Mullen: I'm not resisting!
> Gearin: Stop resisting!
> Mullen: I'm not, I'm not resisting, stop hitting me!
> Gearin: Place your hands behind your back.
> Mullen: My hands are behind my back, I can't breathe [screams].
> Gearin: Are you going to stand on your own and walk?
> Mullen: [indiscernible].
> Mullen: Ah, god, my eye. [screams] Get off my eye! Get your fingers out of my eye! [screams] You're a big tough guy, gouging my eyes out.
> Gearin: [indiscernible] did you get the back one?
> Officer 2: yeah, I got it.
> Gearin: get on your feet!
>      [3:35 There is a rattle of handcuffs tightening]
> Gearin: [indiscernible] stand up on your own. You have anything on you that [indiscernible] stand, pinch, pull, anything on you that's gonna hurt the staff?
> Mullen: [yells], tough guys
> Mullen: [yells], you're breaking my wrist [groans]
> Gearin: alright back him out, back him out
> Mullen: [yells] wound up being personal, huh?

Approximately three minutes after their entry, the team then exits the cell with Mullen. [V.5, 4:55]. Mullen stated to officers that he could not walk on his own and was transferred to the medical unit ("MU") for care via stretcher. [ECF No. 79 ¶ 30; ECF No. 87 ¶ 32; V.5, 5:02 ("You don't understand, I can't walk, I can't feel my legs."); V.5, 5:37 ("You guys really had to fuck me up like that, huh?")]. The video catches Mullen laying on his side on the gurney, the left side of his face is red and swollen. [V.5, 6:40; 8:24]. It is undisputed that no correctional officers were injured or required medical treatment arising from the incident. [ECF No. 87 ¶ 28].

B) **Medical Unit**

Mullen was then brought to the MU where he was cared for by Nurses Robles and Dellovo. [V.5, 14:05- 50:40]. Through the majority of Mullen's treatment, officers' backs blocked the view of the camera. Nurse Robles was focused largely on Mullen's breathing; he was quickly placed on oxygen. [V.5, 15:25-18:40]. Throughout the video of his medical care, the Nurses can be heard saying to Mullen, "okay, stay awake," and coaching to keep Mullen conscious and communicating. [V. 5, 18:40; 19:40]. Nurse Dellovo determined that Mullen should be transferred "out" to a hospital, Nurse Robles agreed. [V.5, 20:44 ("Let's make a phone call and get him out of here.")]. Nurse Dellovo reported via phone that Mullen had (1) a laceration above his left eye, (2) he was vomiting up mucus and having difficulty breathing, and (3) that Mullen was responsive but not cognizant of his surroundings. [V.5, 25:10].

At 27:30 of the video footage, Gearin leaves the room. [V.4, 27:30]. When he returns, he speaks to Nurse Dellovo, but the conversation cannot be heard from the camera. [V.5, 29:00]. A minute later, Officer Gearin pulls another officer out of the room for a discussion. [V.5, 30:00].  Gearin then asked Robles what the medical reason was for sending Mullen out, to which she responded, "his O2 levels" were low, but Dellovo spoke to the provider who approved the hospital transport. [V.5, 31:15-23]. Officers were in and out of the room and discussions were inaudible to the camera. At 33:33 Robles picks up the phone and says, "hey, can you do me a favor . . . " before the audio cuts out for approximately ten seconds, then the rest of the call cannot be heard. [V.5, 33:33-34:47].

At 38:35 of the video, Mullen can be heard waking up from an intervention provided by Nurse Dellovo. [Mullen Dep. 54:20-24 (stating that he did not remember the intervention but assumed Nurse Dellovo woke him by a sternum rub to assess his reaction to pain stimuli)]. For several minutes he is disoriented, uncomfortable, and agitated. Mullen immediately begins complaining about his eye and his ankle. [V.5, 38:35-42:20]. After Mullen is conscious, Officer Geari has a conversation with Nurse Robles

where she is asked to step out of the room. [V5, 42:35-43:05]. After Robles leaves, Mullen can be heard telling Nurse Dellovo, "I can't see anybody." [V.5, 43:25].

At 43:26, Mullen is told he is going to be transitioned to restraints for a hospital transport. While he is being restrained, Mullen can be heard asking officers, "what the fuck happened here?" [V.5, 44:30]. Shortly after the camera catches a quick glimpse of Mullen's face, which is swollen and red, his left eye is nearly swollen shut. [V.5, 47:59; 49:30]. Officers have an inaudible conversation with Mullen while placing him in restraints, then Officer Gearin notes that Mullen is restrained and ready for the hospital transport. [V.5, 49:30-50:40].

It is undisputed that an ambulance was called and then cancelled, and that a determination was made that Mullen would be held for observation in the MU overnight. [ECF No. 87 ¶¶ 37-40, 45]. It is also undisputed that during the evening, Mullen lapsed into unconsciousness and vomited on himself. [ECF No. 79 ¶ 35]. He was then transferred to Leominster hospital. [ECF No. 87 ¶ 46]. At the hospital, Mullen was given a CT scan of his head. [ECF No. 79 ¶ 36]. Mullen was discharged from the hospital the same day. [ECF No. 87 ¶ 50].

### A) Procedural History

On November 20, 2021, Jason Mullen filed the present lawsuit in the United States District Court for the District of Massachusetts asserting claims under the federal Constitution and 42 U.S.C. §1983, as well as under Massachusetts law. Mullen initially brought suit against the Massachusetts DOC, Acting Superintendent Christopher Phillips ("Superintendent Phillips"), Lieutenant James Gearin ("Lieutenant Gearin"), IIPS Officer William Stanhope ("Officer Stanhope"), Sergeant James Tetreault ("Sergeant Tretreault"), Correctional Officer Nicholas Carpeno ("Officer Carpeno"), Correctional Officer Erick Colston ("Officer Colston"), Correctional Officer Matthew Badjo ("Officer Badjo"), and Correctional Officer David Bourgeois ("Officer Bourgeois"), (collectively, "the Defendants"). On April 25, 2022, DOC

6

and its officers moved to dismiss [ECF No. 19], Mullen opposed on June 07, 2022, [ECF No. 24]. The Court dismissed all claims against Massachusetts DOC and Superintendent Christopher Phillips this action, and granted the motion to dismiss for Counts I, II, IV, and V. [ECF No. 28]. The Parties stayed the case to pursue Alternative Dispute Resolution ("ADR"), however through the course of the year, Defendants continued the ADR several times and never met Plaintiff in promised mediation. [See ECF No. 94 at 2]. On July 03, 2024, the Defendants filed a motion for summary judgment on all remaining claims. [ECF No. 77].

## II.    LEGAL STANDARDS

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In reviewing the evidence at the summary judgment stage, the Court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." SEC v. Sharp, 692 F. Supp. 3d 9, 10 (D. Mass. 2023) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)). "However, '[a]t the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" Fernando v. Fed. Ins. Co., No. 18-10504-MBB, 2022 U.S. Dist. LEXIS 44315, at *3 (D. Mass. Mar. 14, 2022) (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)). If a properly supported motion for summary judgment is submitted, the opposing party must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250. The adverse party cannot "rest upon the mere allegations or denials of his pleading," but must instead "present affirmative evidence." Id. at 256–57. Further, opposition to a motion for summary judgment must set forth such facts which are admissible as evidence. Quinones v. Buick, 436 F.3d 284, 291 (1st Cir. 2006); Fed.

R. Civ. P. 56(e)). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of *material* fact." Scott, 550 U.S. at 380 (quoting Anderson, 477 U.S. at 247–48). Summary judgement must be denied "when a disputed fact has the potential to change the outcome of the suit under the governing law if found favorably to the nonmovant[.]" Parrilla-Burgos v. Hernandez-Rivera, 108 F.3d 445, 448 (1st Cir. 1997).

Where the record includes "a videotape capturing the events in question," the Court should "view[] the facts in the light depicted by the videotape." Scott, 550 U.S.at 378. And if "opposing parties tell two different stories, one of which is blatantly contradicted [by the video] so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Id. at 380. In the present case, the authenticity of the video on record is not in dispute, therefore, it is appropriate for the Court to "view the facts 'in the light depicted by the video evidence.'" O'Brien v. Town of Bellingham, 943 F.3d 514, 531 (1st Cir. 2019) (quoting Underwoods v. Barrett, 924 F.3d 19, 20 (1st Cir. 2019) (per curiam)).

## III.    DISCUSSION

Summary judgment hinges on whether there is a genuine dispute as to material facts, as well as on whether the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Although the major events of this incident are largely agreed upon and recorded, there remains significant disputed facts within this case, particularly regarding the placement of the score marks on Mullen's floor, which prompted the MOVE, the scope of force used to restrain Mullen, and the medical-team's motivation for cancelling the called ambulance.

Mullen asserts that after his return to SBCC, he was regularly threatened by officers intent on retribution for the 2017 riot. [ECF No. 87 ¶¶ 4-5]. He argues that an officer made the score marks on his

floor as pretext for the move to segregation to punish him for the riot. [Id. ¶ 8; Mullen Dep., 31:10-20]. He asserts that he was regularly threatened by officers and that the excessive force used was a culmination of those threats. Defendants argue that Mullen placed the score marks on his own floor and Mullen knew that these marks would result in punishment, such as segregation [ECF No. 79 ¶¶ 10, 14]. Defendants argue that the use of force was necessary and approved because Mullen was vocal that he would not comply with being handcuffed. [Id. ¶¶ 15-16].

It is not contested that Mullen verbally refused to comply with officers prior to their entrance into the cell. [ECF No. 87 ¶ 9]. It remains contested whether Mullen physically resisted the officers once he was sprayed by O.C. twice, and the team entered the room. [ECF. 87 ¶ 18 ("Based upon prior experience, the plaintiff offered absolutely no resistance one (sic.) the O.C. spray had been applied and he was knocked to the ground by the shield."); ECF No. 79 ¶ 28 ("When Defendants entered the non-contact visiting room, Plaintiff was again given orders to comply but refused to do so and was being combative and assaultive towards Defendants.")].  Defendants assert that Mullen resisted being cuffed by striking out at officers with his legs, and that the force used was necessary to get Mullen to the ground and shackled. [ECF No. 78 at 5; see ECF No. 79-2 at 52-53].

As this is an excessive force case, these facts are material. Plaintiff asserts that after he was handcuffed, and his feet were shackled while lying on the floor, that Defendants Carpeno and Colston struck Mullen in the head and face approximately 15-20 times. [ECF No. 87 ¶ 21]. There is video provided by Defendants of the MOVE, however, the camera for the duration of the video is pointed directly at officers' backs.

The extent of Mullen's injuries also remains contested. Defendants argue that Mullen's injuries are *de minimus*, and therefore, the Officers should be granted qualified immunity. In the footage provided by Defendants, the video camera at all times avoids Mullen's face. Officers move in a way that the camera,

9

regardless of the angle, seems to block any visual of Mullen during the 50 minutes of recording. [See, generally, V.5].  During transport to the MU, as Officers re-adjust, the Court could see Mullen laying on his side on the gurney, his skin bright red, his face bloodied, and his eyes swollen shut. [V.5, 6:40; 8:24]. The visual was quickly blocked by an officer's back. Mullen asserts that he fell in and out of consciousness and could not use his legs to walk to the infirmary. [ECF No. 87 ¶¶ 21, 26, 31, 32, 35]. There are several instances on the video which would support these assertions.

Mullen asserts that due to his vital signs on arrival to the medical unit, a determination was made to send him "out" to a hospital, and a request for an ambulance was placed. [Id. ¶ 37]. At some point, the ambulance was cancelled, and a decision was made to observe Mullen overnight. [Id. ¶¶ 40, 45]. Mullen asserts that the ambulance cancellation was because the Officers did not want the hospital staff to see the extent of Plaintiff's injuries. [Id. ¶ 29 ("[the] decision not to send him to a hospital was consistent with a cover-up to hide how 'apparent [it was]' that he had suffered some kind of trauma.'")]. Nurse Dellovo testified in her deposition that the decision to cancel the ambulance haunted her and ultimately led her to seek alternative employment. [Id. ¶¶ 41-43; ECF No. 87–4, 20:15–21 ("I remember feeling stuck, like I don't know what to do in this situation because it doesn't – so when you ask me why I left, to me, I had like ethical torment over some of these things. Like I felt that was the wrong decision, but I did not feel there was an outlet for me to pursue what I thought was right.")].

Mullen asserts that after the MOVE, he immediately began to lose vision and feel immense pain in his left eye. [ECF No. 87 ¶ 44]. Mullen states that he was examined by Emergency Room physicians and was diagnosed with an unspecified injury of the head, contusion on his left ankle, and contusion of eyeball and orbital tissue in the left eye. [Id. ¶ 48]. Upon his return to SBCC, Mullen submitted several "sick call slips" and "medical grievances for non-treatment," these requests for medical aid were due to persistent pain and decreased vision in his left eye. [Id. ¶ 51]. Mullen submitted an internal grievance with

the DOC and approximately a year after the incident, was then taken to a doctor due to his complaints about the loss of vision in his left eye. [Id. ¶ 54]. Mullen asserts that a specialized type of CT was recommended by his doctor and never performed. [See Id. ¶¶ 54–55]. He asserts that he now suffers blindness in his left eye due to brain trauma related to this incident, debilitating headaches, anxiety, and Post Traumatic Stress Disorder ("PTSD"). [Id. ¶ 58].

Defendants argue that the score marks were the only reason for the MOVE, [ECF No. 79 ¶ 10], and that reasonable force was used to restrain Mullen, [ECF No. 78 at 3-5]. Defendants assert that Mullen suffered *de minimis* injuries, a laceration above his eye, some bruising due to the force used to restrain him. [ECF No. 78 at 6–10; ECF No. 79 ¶¶ 32–33]. They assert that Nurse Robles noted a small laceration over his left eye, which was treated, and she saw no evidence that Mullen was punched in the face approximately 15-20 times. [ECF No. 79 ¶¶ 31–33]. They state that the decision to keep him overnight at the MU was because he was in "stable condition," and that due to "worsening symptoms," he was transferred to a hospital in the morning. [ECF No. 79 ¶¶ 34–35]. Defendants state that there is no evidence in the medical records that indicate a reason for Mullen's loss of vision. [Id. ¶ 37].

Courts reviewing a summary judgment motion, must not weigh the evidence. Anderson, 477 U.S. at 249. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Id. at 255. A court must proceed with caution when the issues at summary judgment regard pretext, motive, and the intent of the parties. Taite v. Bridgewater State Univ., Bd. of Trs., 999 F.3d 86, 93 (1st Cir. 2021); see Hodgens v. Gen Dynamics Corp., 144 F.3d 151, 167 (1st Cir. 1998).

### A. 42 U.S.C. §1983

Plaintiff brings two claims under 42 U.S.C. § 1983 ("Section 1983") against Defendants, an excessive force claim (Count II) or alternatively, that they failed to intervene to prevent other Defendants

from using excessive force (Count III). The common law claim of intentional assault and battery (Count VI) is dependent on the Section 1983 findings and the claims, therefore, rise and fall together. Raiche v. Pietroski, 623 F.3d 30, 40 (1st Cir. 2010) ("Where a plaintiff alleges both a §1983 excessive force claim and common law claims for assault and battery, our determination of the reasonableness of the force used under §1983 controls our determination of the reasonableness of the force used under the common law assault and battery claims.")

Section 1983 provides a cause of action for monetary damages against state actors sued in their individual capacities "who acted under color of state law to deprive the plaintiff of a right guaranteed by the Constitution or by federal law." Kelley v. LaForce, 288 F.3d 1, 6 (1st Cir. 2002); see also, 42 U.S.C. § 1983. Section 1983 "'is not itself a source of substantive rights,' but merely provides a 'method for vindicating federal rights elsewhere conferred.'" Graham v. Connor, 490 U.S. 386, 393-94 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979)). Accordingly, "[t]o state a claim under §1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988).

a) **Eighth Amendment and Excessive Force, Assault and Battery as to Officers Colston and Carpeno (Counts II and VI).**

The issue here is whether Officers Carpeno, and Colston used excessive force during the MOVE in violation of Mullen's Eighth Amendment rights. Viewing the facts in the light most favorable to Mullen, and drawing all reasonable inferences in his favor, the Court finds that there remain genuine issues of material fact.

The Eighth Amendment prohibits infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. "A claim of cruel and unusual punishment in violation of the Eighth Amendment" has both

an objective and subjective component. <u>See</u> <u>Staples v. Gerry</u>, 923 F. 3d 7, 13 (1st Cir. 2019). To prevail

on the objective prong, Mullen must show that "the alleged wrongdoing is objectively 'harmful enough'

to establish a constitutional violation." <u>Hudson v. McMillian</u>, 503 U.S. 1, 8 (1992) (quoting <u>Wilson v.</u>

<u>Seiter</u>, 501 U.S. 294, 303 (1991)). De minimis uses of physical force cannot constitute Eighth Amendment

violations, but "there is no requirement of 'serious injury.'" <u>Mullen v. Dep't of Corr.</u>, 643 F. Supp. 3d

238, 247 (D. Mass. 2022) (citing <u>Bastien v. Goddard</u>, 279 F.3d 10, 14-16 (1st Cir. 2002)). "The Supreme

Court has made clear that it is the force used, and not the injury incurred, that is the focus of the objective

prong analysis." <u>Segrain v. Duffy</u>, 118 F.4th 45, 56 (1st Cir. 2024) (quoting <u>Wilkins v. Gaddy</u>, 559 U.S.

34, 38 (2010)). In <u>Wilkins</u>, the Supreme Court explained that "the injury and force . . . are only imperfectly

correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does

not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape

without serious injury." <u>Id.</u> (citing <u>Wilkins</u>, 559 U.S. at 38).

     In the prison context, the subjective prong of the Eighth Amendment excessive force analysis

"turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously

and sadistically for the very purpose of causing harm." <u>Hudson</u>, 503 U.S. at 6 (quoting <u>Whitley v. Albers</u>,

475 U.S. 312, 320-21 (1986)). In evaluating an excessive force claim under the Eight Amendment, the

Court is directed to consider the "Whitley factors," which include:

> (1) The extent of the threat to the safety of staff and inmates, as reasonably
> perceived by the responsible officials, (2) the need for the application of
> force, (3) the relationship between the need and the amount of force that
> was used, (4) the extent of the injury inflicted, and (5) any efforts made to
> temper the severity of a forceful response.

<u>Segrain</u> 118 F. 4th at 56-57 (quoting <u>Staples v. Gerry</u>, 923 F.3d 7, 13 (1st Cir. 2019) and <u>Whitley</u>, 475

U.S. at 321). "Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will

support a reliable inference of wantonness in the infliction of pain under the standard we described, the case should not go to the jury." Whitley, 475 U.S. at 322.

Even if a plaintiff produces sufficient evidence from which a reasonable jury could find a constitutional violation, a defendant official may still be entitled to summary judgment on that constitutional claim based on qualified immunity. The doctrine provides public officials "breathing room to make reasonable but mistaken judgments about open legal questions." Ashcroft v. Al-Kidd, 563 U.S. 731, 743 (2011). However, "qualified immunity does not shield public officials who, from an objective standpoint, should have known that their conduct was unlawful." Haley v. City of Boston, 657 F.3d 39, 47 (1st Cir. 2011) (quoting Pagan v. Calderon, 448 F.3d 16, 31 (1st Cir. 2006) (internal quotations omitted). "Qualified immunity protects government officials from being sued in their individual capacities for damages unless '(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time.'" Armas v. Alves, 723 F. Supp. 3d 104, 113 (D. Mass. 2024) (quoting Irish v. Fowler, 979 F. 3d 65, 76 (1st Cir. 2020)). "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." Dist. of Columbia v. Wesby, 583 U.S. 48, 63 (2018). To be clearly established, the legal principle must be "settled law." Id. (citation omitted). The Court must consider "whether under the plaintiff's version of the facts[,] a reasonable officer should have known that the degree of force . . . applied not 'in a good-faith effort to maintain or restore discipline' would violate the Eighth Amendment." Armas, 723 F. Supp. 3d at 113 (quoting Morelli v. Webster, 552 F.3d 12, 25 (1st Cir. 2009); see Hudson, 503 U.S. at 7; Mullen, 643 F. Supp. 3d at 249-50.

Mullen's case turns on who should be believed about what occurred in the cell while he was being handcuffed by Officer Colsten and Carpeno. A camera was recording but the parties were out of sight from any cameras and the audio is largely distorted. There are approximately three minutes of recording

where the parties are blocked from view. There are several factual disputes about what occurred out of the camera's view, which could alter the outcome of the case. Mullen alleges that after the second spray of O.C., the Officers entered his cell, hit him with a shield and he was immediately brought to the ground. [ECF No. 87 ¶ 17]. He asserts that once he was knocked to the ground, he offered no physical resistance, but his hands were under his body to catch him from his fall. [ECF No. 87 ¶ 27; Mullen Dep., 51:4-16]. He asserts that Officer Colston and Carpeno, after fully restraining him with handcuffs and leg irons, punched his head and face approximately 15-20 times. He asserts that he was not resisting and while he was hit by the Officers, he fell in and out of consciousness. [ECF No. 87 ¶¶ 21, 26].

Defendants assert that they used force only as reasonably necessary to restrain Mullen. [See 78 at 3-5]. They argue that Mullen was physically combative after they entered the room and was hiding his hands under his body and thrashing his legs out to hit the officers. [ECF No. 79 ¶ 28; V.5 1:42-3:00]. Defendants argue that there was no evidence that Mullen was punched in the face and head as alleged. [ECF No. 79 ¶ 33 ("Ms. Robles did not see any other signs of head trauma to Plaintiff nor did she see any evidence that he was punched in the face and head approximately 15 to 20 times. . . .")]. Defendants at the motion to dismiss stage, and now again at summary judgment, argue that the use of force was reasonable because plaintiff was non-compliant and resisting the correctional officers. There has been sufficient information provided to conclude, including the concession from Plaintiff, that Mullen verbally resisted the MOVE by Defendants prior to being sprayed by the OC spray, which was the basis for the initial authorization of force. [ECF No. 79 ¶16; see, e.g., 79-2].

The issue remains whether Mullen *physically* resisted defendants *after* he was sprayed by O.C. and shackled to justify the force used in this interaction, and whether the allegation of the assault itself is true. The Court must view the evidence provided in a light most favorable to the non-moving party, Mullen. Sharp, 692 F. Supp. 3d at 10 (citation omitted). The Supreme Court in Hudson, held that analogous

15

behavior as asserted by Mullen – officers punching an inmate in the mouth, eyes, chest, and stomach after he was shackled – met the standard of "clearly excessive and occasion[ing] unnecessary and wanton infliction of pain." Hudson, 503 U.S. at 4-5. These allegations, taken with the motive supplied by plaintiff, that Officer Carpeno had threatened the plaintiff with extrajudicial punishment for his participation in the riot, lends additional support for the allegation. It was clearly established that the Eighth Amendment protects inmates against uses of force that "did not further any sort of disciplinary or safety rational and merely inflicted pain." Mullen, 643 F. Supp. 3d at 248 (referencing Perry v. Dickhaut, 125 F. Supp. 3d 285, 298 (D. Mass. 2015)); see Hudson, 503 U.S. at 1. Therefore, under these facts, a reasonable defendant would have known whether his conduct was unconstitutional.

Since the officers were out of view from the camera, the timeline of events remains unclear, given the fact that seven officers were present to subdue Mullen and the speed at which he may have been put in restraints, there is a dispute of fact as to whether Mullen was beaten severely and disproportionately after he was no longer a threat. "The question of what force was applied after the threat [Mullen] posed subsided presents a trial-worthy issue." Clergeau v. Mass. Dep't of Corr., 714 F. Supp. 3d 8, 16 (D. Mass. 2024). A jury could find that the Officers used force "maliciously and sadistically for the very purpose of causing harm . . . rather than in a good-faith effort to maintain or restore discipline." Skinner, 430 F.3d at 488.

Because these material factual issues remain in dispute, the Court "is unable to ascertain whether the Officer[s] . . . are entitled to qualified immunity." Clergeau, 714 F. Supp. 3d at 20. Any reasonable prison official would have understood that, if the assault allegations are true, such a malicious infliction of unnecessary pain would violate a prisoner's constitutional rights. Perry, 125 F. Supp. 3d at 298. Where the material factual issues remain in dispute at summary judgment regarding qualified immunity, "the

Court can wait until after the facts have been settled to determine whether the officer's conduct was objectively reasonable and falls under the qualified immunity umbrella." Clergeau, 714 F. Supp. 3d at 20.

Therefore, the summary judgment motion as to Counts II and VI is **DENIED.**

### b)  Fourteenth Amendment, Failure to Intervene as to Officers Gearin, Tetreault, Stanhope, Badjo, and Bourgeois (Count III)

Mullen brings a claim of failure to intervene against Officers Gearin, Tetreault, Stanhope, Badjo, and Bourgeois (the "Bystander Defendants"). Viewing the facts in the light most favorable to Mullen, and drawing all reasonable inferences in his favor, the Court finds that there remain genuine issues of material fact.

The duty to intervene arises from the Fourteenth Amendment's substantive due process doctrine. See Davis v. Rennie, 264 F.3d 86, 97-98 (1st Cir. 2001). Under the Fourteenth Amendment, "[a]n officer may be liable not only for his personal use of excessive force, but also for his failure to intervene in appropriate circumstances to protect an arrestee from the excessive use of force by his fellow officers." Wilson v. Town of Mendon, 294 F.3d 1, 6 (1st Cir. 2002).

In order to prevail on this claim, Mullen must adequately plead that non-participating defendants were (1) present, (2) actually observed the excessive force, (3) were in a position to realistically prevent the use of excessive force, and (4) there was sufficient time to prevent the use of excessive force. See Davis, 264 F.3d at 97. "An attack that is over 'in a matter of seconds' cannot normally give rise to liability under a duty to intervene claim because it is not realistic to expect other officers to quickly intervene— the third and fourth prongs fail." Mullen, 643 F. Supp. at 251 (citing Gaudreault, 923 F.2d at 207 n.3). There is no requirement of a showing that the action "shocks the conscience" when the incarcerated individual is not resisting the force. Id.

The allegation here is that the Bystander Defendants failed to intervene while Officers Colston and Carpeno allegedly used excessive force against Plaintiff. The complaint and corresponding evidence, (e.g., the video recording and officer incident reports filed), confirms that these Defendants were present and actually observed the move where the alleged excessive force occurred. [ECF No. 87-2; ECF No. 87-3]. As noted in the qualified immunity analysis provided by Judge Hillman in the motion to dismiss order, because any reasonable officer would recognize the force allegedly applied by Officers Colston and Carpeno was excessive, "whether applying it themselves or witnessing it," there was an impetus to intervene. [ECF No. 28 at 16]. During the MOVE, there were seven defendants present to move one inmate, two are accused of excessive force, five are accused of being bystanders. The Bystander Defendants were in a "realistic position to intervene." Mullen, 643 F. Supp. at 251. There are approximately three minutes between when Defendants entered the cell and exited with Mullen. The allegation is that Plaintiff was struck by Defendants 15-20 times, if true, there was ample time for the Bystander Defendants to intervene. [V.5, 1:42-4:55].

Since there is a genuine issue of material fact as to whether Defendant Officers Carpeno and Colston used excessive force against Mullen, there is also a genuine issue of material fact as to whether the Bystander Defendants failed to intervene. See Miranda-Rivera v. Toledo-Davila, 813 F.3d 64, 73 (2026) (holding that the failure to intervene claims were ultimately tied to the jury's determination of excessive force against other officer defendants.).

Therefore, the motion for summary judgment as to Count III against the Bystander Defendants is **<u>DENIED.</u>**

**c) Intentional infliction of emotional distress (Count VII)**

Mullen brings claims of intentional emotional distress ("IIED") against Officers Carpeno and Colston. Viewing the facts in the light most favorable to Mullen, and drawing all reasonable inferences in his favor, the Court finds that there remain genuine issues of material fact.

Intentional Infliction of Emotional Distress is a common law claim governed by state law. To make a claim for IIED in Massachusetts, Mullen must show:

> (1) that the [defendant] intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous, was beyond all possible bounds of decency and was utterly intolerable in a civilized community; (3) that the actions of the defendant were the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe and of a nature that no reasonable [person] could be expected to endure it.

Agis v. Howard Johnson Co., 355 N.E.2d 315, 318-19 (Mass. 1976) (citations and internal quotation marks omitted). "The standard for making a claim of intentional infliction of emotional distress is very high." Martinez v. City of Worcester, 502 F. Supp. 3d 606, 621 (D. Mass. 2020) (quoting Doyle v. Hasbro, Inc., 103 F.3d 186, 195 (1st Cir. 1996). "Actual injury is not a prerequisite for an IIED claim" but the use of physical force may support a Plaintiff's assertion that the conduct was extreme and outrageous. Id.

Defendants Carpeno and Colston assert that there is no evidence that their actions rise to the high standards of IIED, but show "simply two officers doing their job because Plaintiff refused to comply with orders." [ECF No.78 at 15]. Defendants also assert that there is no evidence that Plaintiff suffered emotional distress that is "severe." [Id.]

Given that the excessive force claim against Officers Carpeno and Colston requires the Court to find that the force was used "for the very purpose of causing harm," if a reasonable jury finds these allegations to be true, the first prong in the analysis is easily met. There remain significant facts in dispute for this case regarding the actual conduct of the Officers out of view from the video, and therefore the second prong is still in dispute.

A plaintiff may prevail on an IIED claim in the absence of medical or psychiatric evidence documenting their emotional distress, particularly when medical records and photos document the physical injury. See, e.g., Poy v. Boutselis, 352 F.3d 479, 485–86 (1st Cir. 2003) (holding that, "although there was no medical or psychiatric evidence, there was considerable testimony" for a reasonable jury to infer severe emotional distress); Ciolino v. Eastman, 128 F. Supp. 3d 366, 379 (D. Mass. 2015) ("Plaintiff[] [is] not required to present medical evidence for a jury to find that their alleged distress was caused by the Defendants' conduct."). See Cady v. Marcella, 729 N.E.2d 1125 (Mass. App. Ct. 2000) (holding there was sufficient evidence for a jury to determine plaintiffs' IIED claim and noting that expert medical testimony is not required to establish a causal connection.).

For purposes of IIED, whether a "Plaintiff[']s[] alleged distress was 'severe' enough to give rise to liability is a question that should be resolved by a jury." Id. If Plaintiff meets his civil burden of proof that the Officers used excessive force, a reasonable jury could conclude that Mullen suffered from severe distress considering the medical records related to his injuries, the video provided by parties as evidence, and the deposition statements provided by Mullen and Nurse Dellovo, which state that Mullen suffered traumatic injuries and has suffered headaches, anxiety, and loss of eyesight as a result of the incident. [ECF No. 87 ¶¶ 57-58; Mullen Dep., 100:09-102:24; see ECF No. 87-4]. As the court in Poy held after reviewing similar non-medical/psychiatric evidence of emotional distress, "[a] jury could reasonably infer from such humiliation, long continued pain, and facial disfigurement a condition of severe emotional distress." Poy, 352 F.3d at 485-86. Accordingly, the motion for summary judgment on Count VII is **<u>DENIED</u>**.

**B.  Issue of Expert Witness and Testimony; Defendant's Motion to Strike [ECF No. 92]**

The Defendants assert that the Court must grant summary judgment because the Plaintiff has not proffered an appropriate expert witness to testify to Plaintiff's long-term medical injuries and the issue of causation in this case under Fed. R. Civ. P. 26. The Court disagrees.

In short, the DOC Defendants aver that "Section 1983 imposes a causation requirement similar to that of ordinary tort law," and that causation must be established through expert opinion. [ECF No. 78 at 8-9 (quoting Maldonado Santiago v. Velazquez Garcia, 821 F. 2d 822, 831 (1st Cir. 1987))]. Actions under Section 1983 are governed by common law tort principles. See Heck v. Humphrey, 512 U.S. 477, 483 (1994). Although a "causal link" between an action and injury "generally must be established by expert testimony, . . .  [w]here a reasonable juror could infer causation from other evidence, expert testimony is not required to establish causation. Crooker v. United States, No. 13-30199-FDS, 2015 U.S. Dist. LEXIS 12386, at *11 (D. Mass. Feb. 3, 2015). In Crooker, the court explained that the plaintiff could

> testify not only as to the alleged pain and suffering they caused him, but as to their timing – when they began and when they ended (if at all) . . . . Although "correlation is not causation," this level of correlation could (again, depending on the specific testimony) be sufficiently strong that a reasonable jury could conclude that it is more probable than not that plaintiff's headaches were caused by [defendant's actions].

Id. Plaintiff did not properly file an expert disclosure and corresponding written report within the guidelines of Fed. R. Civ. P. 26. After the summary judgment motion was filed, Plaintiff proffered testimony from the ER physician who treated Mullen, to opine to the relationship between brain trauma and loss of vision. [ECF No. 94 at 3-4].

Defendants were correct that Plaintiff failed to timely file an Expert Disclosure pursuant to Fed. R. Civ. P. 26, and the Court **granted** Defendants' motion to strike due to untimeliness and because the designation of Dr. Rosenbaum, Mullen's treating physician at the Leominster ER, was an improper expert

designation. [ECF No. 104]; [5] see Fed. R. Civ. P. 26 (a)(2) ("Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report—prepared and signed by the witness . . . ."). An unretained witness with specialized knowledge, such as a treating physician, may give opinions based on the witness's own involvement in the circumstances of the case when "his opinion testimony arises not from his enlistment as an expert but, rather from his ground-level involvement in the events giving rise to the litigation." Downey v. Bob's Discount Furn. Holdings, Inc., 633 F. 3d 1, 6, (1st Cir. 2011). Treating physicians may not provide opinions, however, beyond those formed during their treatment of their patient that are reflected in their treatment notes. See Gomez v. Rivera Rodriguez, 344 F.3d 103, 113 (1st Cir. 2003).

For the purpose of determining this summary judgment motion, there are enough material facts in dispute that the Court's decision is not dependent on an expert report. See Anderson, 477 U.S. at 247-48; Fed. R. Civ. P. 56(a) (summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law"). The Court declines to grant summary judgment on the basis that no medical expert has been disclosed. Mullen may testify "as to the alleged" injuries and "their timing – when they began and when the ended (if at all)," including by referring to, for example, his prison medical and progress records, and his sick call slips, so long as he can sufficiently establish their admissibility. See Crooker, 2015 U.S. Dist. LEXIS 12386, at *11.

---

[5] On March 31, 2025, the Court granted the Motion to Strike via e-order, "District Judge Margaret R. Guzman: ELECTRONIC ORDER entered granting [ECF No. 92] Defendants' Motion to Strike. Plaintiff's notice has failed to satisfy the Expert Witness Disclosure Requirements under Federal Rules of Civil Procedure 26(a)(2)(B). See Pena-Crespo v. Puerto Rico, 408 F.3d 10, 13 (1st Cir. 2005). The Court's reasoning will follow. (SF) (Entered: 04/03/2025)." [ECF No. 104]. This Order serves as an explanation of the Court's reasoning.

IV.    **CONCLUSION**

For the reasons stated above, the Motion for Summary Judgment, [ECF No. 77], and the Motion to Strike, [ECF No. 92], are **DENIED.**

**SO ORDERED.**

Dated: September 9, 2025

                                          /s/ Margaret R. Guzman
                                          Margaret R. Guzman
                                          United States District Judge